UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PHILADELPHIA INDEMNITY INSURANCE CO., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CV-09-238-B-W |
| EMPLOYERS INSURANCE COMPANY OF WAUSAU, | ) ) ) | |
| Defendant. | ) ) | |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Philadelphia Indemnity Insurance Company (Philadelphia) sued Employers Insurance Company of Wausau (Wausau) for contribution for the cost of defending and settling a claim brought against an insured driver. Wausau counter-claimed seeking a judgment that Philadelphia is solely responsible for defense and settlement costs in excess of the driver's primary insurance. Concluding that the Philadelphia policy is essentially a primary policy and the Wausau policy a true excess policy, the Court grants Wausau's cross-motion for summary judgment.

**I.     STATEMENT OF FACTS[1]**

Loueen Lovely sued Arnold Mushero in state court for $650,000 in damages resulting from an automobile accident that occurred on March 17, 2006 in Levant, Maine. At the time of the accident, Mr. Mushero was operating his own vehicle as a volunteer driver for Penquis C.A.P., Inc. (Penquis), a non-profit organization that provides, among other services, transportation to poor residents in Maine.

---

[1] The parties do not dispute the relevant facts.

Mr. Mushero held a $100,000 personal automobile insurance policy with Concord General Mutual Insurance Company (Concord), and was also covered by policies Penquis carried with Philadelphia and Wausau. Concord and Philadelphia defended and indemnified Mr. Mushero, but Wausau refused to do either.

On June 9, 2009, Philadelphia filed suit seeking a declaratory judgment that Wausau was obligated to contribute to the cost of defense and to indemnify Mr. Mushero and a definition of the proportionate shares Wausau and Philadelphia must contribute. *Compl.* (Docket # 1).[2] On August 7, 2009, Wausau answered and counterclaimed against Philadelphia seeking a declaration that Philadelphia is contractually obligated to defend Mr. Mushero and Penquis and to indemnify Mr. Mushero and that Wausau has no duty to do so. *Answer and Counterclaim* (Docket # 6). On October 29, 2009, Ms. Lovely settled her suit for $385,000, with Concord paying $100,000 and Philadelphia paying $285,000. Wausau did not contribute to the defense or the settlement. On January 5, 2010, Philadelphia amended its complaint against Wausau to specify that it sought $154,700.39 in contribution, half of its costs incurred in defending and settling Ms. Lovely's lawsuit. *Am. Compl.* (Docket # 13).

Philadelphia moved for summary judgment on January 15, 2010, contending that because Philadelphia's and Wausau's policies are both excess policies in relation to Mr. Mushero, they must pay equally towards the cost of defense and settlement over the $100,000 coverage provided by Concord. *Philadelphia's Mot. for Summ. J.* (Docket # 16). Wausau moved for summary judgment on January 29, 2010, arguing that because Philadelphia was essentially a

---

[2] The suit was brought pursuant to 28 U.S.C. § 1332(a)(2). Philadelphia claims the Court has diversity jurisdiction because it is a Pennsylvania corporation, Wausau is a Wisconsin corporation, and the amount in controversy exceeds $75,000. *Compl.*

primary policy and Wausau a true excess policy, Wausau was not obligated to pay until Philadelphia's policy was exhausted. *Wausau's Mot. for Summ. J.* (Docket # 18).[3]

Wausau replied to Philadelphia's summary judgment motion on February 5, 2010. *Wausau's Resp. in Opp'n to Philadelphia's Mot. for Summ. J.* (Docket # 20) (*Wausau's Opp'n to Philadelphia's Mot.*). On February 18, 2010, Philadelphia responded to Wausau's motion for summary judgment and replied to Wausau's response to its own motion for summary judgment. *Philadelphia's Resp. in Opp'n to Wausau's Mot. for Summ. J.* (Docket # 22) (*Philadelphia's Opp'n to Wausau's Mot.*); *Philadelphia's Reply to Wausau's Resp. in Opp'n to Philadelphia's Mot. for Summ. J.* (Docket # 24) (*Philadelphia's Reply to Wausau's Opp'n*). On February 24, 2010, Wausau replied to Philadelphia's response to its motion for summary judgment. *Wausau's Reply to Philadelphia's Resp. in Opp'n to Wausau's Mot. for Summ. J.* (Docket # 28) (*Wausau's Reply to Philadelphia's Opp'n*).

### A.    Philadelphia's Policy

Philadelphia's policy provides Penquis up to $1,000,000 in coverage for "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'." *Philadelphia Policy*, Attach. A, "Business Auto Coverage Form" at 2

---

[3] Wausau also argues that it is not obliged to pay because as an umbrella policy it is exempt pursuant to Maine statute, 14 M.R.S.A. § 158-A(3). Section 158-A(1)(a) specifies that volunteers for charitable organizations are immune from civil liabilities. However, subsection 3 lays out an exception:
> A . . . volunteer is considered to have waived immunity from liability when the cause of action arises out of the . . . volunteer's operation of a motor vehicle, . . . for which the operator or the owner of the vehicle . . . is required to possess an operator's license or maintain insurance. The amount of damages in an action authorized by this section may not exceed the combined limits of coverage of any applicable insurance policies other than umbrella insurance coverage.

Philadelphia and Wausau dispute the affect of the phrase "other than umbrella insurance coverage." Wausau contends that because its policy provides umbrella coverage, it has no duty to contribute under the terms of subsection 3. Philadelphia responds that Wausau's policy does not provide umbrella coverage but even if it did, subsection 3 limits the amount of damages not whether umbrella policies must contribute.
  Finding that the Philadelphia policy is primary, the Court does not reach the issue.

3

(Docket # 17). For purposes of liability coverage, "*any* auto is a 'covered auto.'" *Mot. for Summ. J.* at 5.

As a volunteer driving a non-Penquis-owned vehicle, Mr. Mushero was covered by endorsement: "Anyone volunteering services to [Penquis] is an 'insured' while using a covered 'auto' [that Penquis doesn't] own, hire or borrow to transport [Penquis'] clients or other persons in activities necessary to [Penquis'] business." *Philadelphia Policy*, Attach. A, "Social Service Agencies—Volunteers as Insureds."

Although Philadelphia provided primary coverage to Penquis-owned vehicles, it provided only excess coverage to Mr. Mushero's vehicle: "For any covered 'auto' you own, this Coverage Form provides primary insurance. For any covered 'auto' you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance." *Philadelphia Policy*, Attach. A, "Business Auto Coverage Form" at 8.

Philadelphia's policy further specifies that

> When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all Coverage Forms and policies covering on the same basis.

*Id.* at 9.

### B.     Wausau's Policy

Wausau's policy provides $500,000 worth of coverage for Volunteers Insurance Service Association Inc. (VISA), a nationwide organization. *Wausau's Policy*, Attach. C. at 1 (Docket # 19). Because Penquis is a member of VISA, all registered volunteers are insured by Wausau. Under the heading "Volunteer Excess Auto Liability," Wausau specifies that

> We will pay all sums in excess of the "retained limit" that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage," or "personal injury" to which this insurance applies.

4

*Wausau's Policy*, Attach. C., "Volunteers Insurance Service Combined Excess Liability Policy" at 1. "Retained limit" means the greater of:

> 1. An amount equal to the applicable limits of insurance of any other insurance collectible by the insured; or
> 2. An amount equal to the minimum limit of insurance required under the motor vehicle financial responsibility law of the state or province in which the "accident" occurs or $50,000 whichever is less.

*Id*. at 13. The Wausau Policy also contains an "Other Insurance" clause that states "[i]f other insurance is available to the insured for a loss we cover . . ., this insurance is excess over that other insurance and will not apply until all other applicable insurance has been fully exhausted. This insurance will not contribute with such other insurance." *Id*. at 8.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a summary judgment motion, "[a] genuine issue exists where a 'reasonable jury could resolve the point in favor of the nonmoving party.'" *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009) (quoting *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000)). "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotations omitted) (quoting *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997)).

Where, as here, the parties have filed cross-motions for summary judgment, the court must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004). The

presence of cross-motions for summary judgment "does not alter or dilute" the summary judgment standard. *Kunelius v. Town of Stow*, 588 F.3d 1, 8 (1st Cir. 2009).

Because the question comes to the Court on diversity jurisdiction, "Maine law supplies the substantive rules of decision." *Medical Mut. Ins. Co. of Maine v. Indian Harbor Ins. Co.*, 583 F.3d 57, 60 (1st Cir. 2009) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).[4] Under Maine law, interpretation of an insurance contract "is an issue of law for a court." *Bristol West Ins. Co. v. Wawanesa Mut. Ins. Co.*, 570 F.3d 461, 463 (1st Cir. 2009); *Foremost Ins. Co. v. Levesque*, 2005 ME 34, ¶ 7, 868 A.2d 244, 246. Because the only question—the order of payment between Philadelphia and Wausau—is a legal one, the issue is ripe for summary judgment.

### B. Position of the Parties

#### 1. Wausau

Wausau contends it has no obligation to contribute because true excess policies are only liable after primary, and essentially primary, policies have been exhausted. *Wausau's Mot for Summ. J.* at 14-15 (citing *Globe Indem. Co. v. Jordan*, 634 A.2d 1279, 1284 (Me. 1993)). Wausau describes Philadelphia's coverage as parallel to Concord's: both policies provide primary coverage to a named insured and to any person permissibly driving one of the vehicles listed on the policy. *Id.* at 9-10. To avoid duplicative insurance, both policies include "other insurance" clauses that stipulate the insurance is excess when the insured is driving a vehicle not listed under the policy. *Id.* at 10. Although the fact Mr. Mushero was driving a vehicle listed on Concord's policy makes Concord's policy primary and Philadelphia's excess, Wausau argues that if Mr. Mushero had been driving a Penquis vehicle, the roles would be reversed, with Philadelphia's primary and Concord's excess. *Id.* at 11. Wausau further hypothesizes two

---

[4] The parties assume Maine law applies; the Court agrees.

scenarios under which Philadelphia would be obligated to provide primary insurance to Mr. Mushero even if he was driving a non-Penquis-owned vehicle: if Mr. Mushero had no personal insurance or he was driving an uninsured vehicle owned by a third-party. *Id*. Wausau concludes that "the principle liability exposure for both Concord and Philadelphia arose from the use of the owned vehicles listed on their respective policies, which is primary exposure; and even some of the situations involving non-owned vehicles would also result in primary exposure." *Id*.

Wausau contrasts Philadelphia's policy with its own "true excess policy." *Id*. Wausau begins with the basic difference in titles, contending that the "title of an insurance policy is one of several indicia" of the true nature of a policy. *Id*. Wausau points to the word "excess" in its policy's title, as well as multiple references within the text, whereas the Philadelphia policy "nowhere identifies itself as an 'excess' or 'umbrella' policy." *Wausau's Opp'n to Philadelphia's Mot.* at 11. Wausau also emphasizes fundamental structural differences between the policies: unlike Concord's and Philadelphia's policies that were specifically issued to Mr. Mushero and Penquis, Wausau's neither lists individual vehicles nor individual organizations, instead providing "excess auto liability coverage for roughly 80,000 volunteer drivers in all 50 states. . . . for a premium of only $5.25 per volunteer per year." *Wausau's Mot. for Summ. J.* at 12.[5] In addition, Wausau highlights how unlike Philadelphia's policy where "[i]t is the happening of the accident that triggers the coverage," Wausau's obligations do not commence until the policy's retained limit is met. *Wausau's Opp'n to Philadelphia's Mot.* at 11. Finally,

---

[5] In support of these assertions, Wausau cites paragraph 30 of its statement of material fact. *Wausau's Mot. for Summ. J.* at 12. Philadelphia interposed a qualified admission to Wausau's paragraph 30, but the qualification was not related to these assertions. Accordingly, the Court takes the assertions as admitted for purposes of the motion for summary judgment. Brian Pontius' declaration reveals how these figures were derived. The Declaration Page of Wausau's insurance policy reflects a total earned premium of $419,580 at a rate of $5.25 per volunteer per year. *Wausau's Policy*, Attach. C., "Volunteers Insurance Service Combined Excess Liability Declarations" at 1. Mr. Pontius' figure of 79,920 volunteers was calculated by dividing the total premium by the rate per volunteer. *Pontius Aff.* ¶ 5. The Declaration Page is part of the insurance contract. *See Apgar v. Commercial Union Ins. Co.*, 683 A.2d 497, 498-99 (Me. 1996) (considering a policy's declaration page as part of the insurance contract). As it involves simple math, Mr. Pontius's figure is a logical corollary drawn from the policy terms.

Wausau finds differences between the two policies' "other insurance" clauses, emphasizing that Wausau's specifically states that it "will not apply *until all other applicable insurance has been fully exhausted*," whereas Philadelphia's policy specifies situations in which it will contribute. *Id*. at 11-12.

### 2. Philadelphia

Philadelphia acknowledges that "if its policy provided essentially—or even *any*—primary coverage to *Mr. Mushero*," Wausau might be correct. *Philadelphia's Mot. for Summ. J.* at 14. However, Philadelphia contests the characterization of its policy as "essentially primary" in relation to Mr. Mushero because "[i]nsurance for covered autos that Penquis does not own is *always* excess over any other collectible insurance." *Id*. at 15. Philadelphia asserts that volunteer drivers for Penquis are only insured when driving non-Penquis-owned vehicles and can only become a volunteer driver if they agree that their vehicle will "be insured at the minimum vehicle insurance rates established by the State of Maine." *Philadelphia's Reply to Wausau's Opp'n* at 3. According to Philadelphia, the practical effect of requiring Mr. Mushero to drive only an insured vehicle is to place Philadelphia in the same position as Wausau: because both policies are excess to Mr. Mushero's required coverage, "the two policies insure the same level of risk." *Id*. at 5. Philadelphia concludes that in such a situation where both policies attempt to "make[] themselves excess over all other insurance," the Maine Law Court holds "that both insurers must contribute equally to the limits of the smaller policy." *Id*. at 5 (citing *Carriers Ins. Co. v. American Policyholders' Ins. Co.*, 404 A.2d 216, 219 (Me. 1979)).

### C. *Globe*, *Carrier*, *Allstate*, *Aetna*, and *Insurance Company of North America*

Multiple meanings of the phrase "excess insurance" and frequent use of "other insurance" clauses confuse the distinction between an essentially primary policy providing excess coverage

and a true excess policy. However, courts recognize a clear difference between these two types of coverage, as evidenced in *Globe*, *Carrier*, *Allstate*,[6] *Aetna*,[7] and *Insurance Company of North America*.[8]

In *Globe*, the Maine Law Court addressed whether an insurance policy found to be excess to a primary insurance policy was required to contribute to defense costs before the primary policy was exhausted. The Law Court began by acknowledging the general rule that an umbrella or pure excess policy is under no obligation to contribute "until and unless the primary coverage is completely exhausted." *Globe*, 634 A.2d at 1284. In holding that the excess provider was nonetheless required to contribute, the Law Court emphasized how the policy at issue usually provided primary coverage to the insured and was excess only because the insured was "operating a vehicle other than her own" at the time of the accident. *Id*. The Law Court concluded that the policy did not "provide coverage in great amounts for a relatively modest premium," the hallmark of a true excess policy. *Id*.

Similarly, in *Carriers*, the Law Court identified two insurance policies as primary, despite excess insurance clauses declaring that they were excess. A driver was responsible for a serious accident while driving a vehicle leased by his employer, and the insurance policies of both the rental company and his employer provided coverage. *Carriers*, 404 A.2d at 217-18. Both insurance policies, however, included "other insurance" clauses that made the policies excess over any other valid policy that applied. *Id*. at 218. The Law Court recognized that both policies would have been primary but for the existence of the other policy and that if both clauses were given effect, "both would escape liability." *Id*. at 219. In order to avoid this "ad

---

[6] *Allstate Ins. Co. v. Employers Liability Assur. Corp.*, 445 F.2d 1278 (5th Cir. 1971).
[7] *Aetna Casualty and Surety Co. v. U. S. Auto. Assn.*, 676 F. Supp. 79 (E.D. Pa. 1987).
[8] *Ins. Co. of N. Am. v. Am. Economy Ins. Co.*, 746 F. Supp. 59 (W.D. Okl. 1990).

absurdum conclusion," the Law Court ignored the clauses, treating both policies as "primary" and ordering "that both insurers share in the loss." *Id*.

Other jurisdictions have identified additional factors relevant to whether a policy is essentially primary or truly excess. In *Allstate*, a driver of a vehicle leased to his employer was responsible for a serious accident and four separate insurance policies applied: the policy from the rental company was stipulated as the primary policy; the driver's individual Allstate Insurance Company (Allstate) policy provided primary coverage for vehicles owned by the driver; the employer's United States Fidelity & Guaranty Company (USF&G) policy provided primary coverage for vehicles owned by the employer; and Employers' Liability Assurance Corp. (Employers) provided "umbrella coverage" to the rental company. The Allstate and USF&G policies contained "other insurance" clauses, specifying that coverage was excess as to non-owned vehicles.

The Fifth Circuit concluded that Employers was a true excess policy and Allstate and USF&G were essentially primary policies, "although, insofar as is pertinent to the covered occurrence here involved, they promised their insured only secondary or excess coverage." *Allstate*, 445 F.2d at 1283. Turning to the policies, the Court emphasized that the Employers policy was unique in relation to the other three insurers because it alone assumed "only residual loss coverage in every event." *Id*. at 1283. In reaching this conclusion, the Court emphasized how coverage priorities should be allocated in "light of total policy insuring intent." *Id*. at 1284. Here, the Employers' policy was titled "umbrella policy"; was more extensive, covering a number of businesses and extending to nine different types of liability coverage; and required the maintenance of underlying insurance. *Id*. at 1279-80, 1283-84. The Court held that Employers

was not obligated to contribute pro rata with underlying primary policies containing excess clauses for non-owned vehicles. *Id*. at 1284.

In *Aetna*, a federal district court in Pennsylvania faced a similar priorities question involving the driver of a borrowed vehicle. The driver held a $300,000 policy with United Services Automobile Association (USAA) and the owner of the vehicle held two policies with Aetna Casualty and Surety Company (Aetna), one with limits of $250,000 and one with limits of $1,000,000. The parties agreed that Aetna's $250,000 policy was primary, but USAA argued that Aetna's second policy for $1,000,000 was not a true excess policy and should be prorated with its $300,000 policy. *Aetna*, 676 F. Supp. at 80.

The Court gave four reasons for concluding that Aetna's $1,000,000 policy was an umbrella or true excess policy. First, the policy provided the named insured significant extended coverage for a relatively low premium; second, the policy was labeled "excess indemnity policy"; third, the named insured was required to maintain underlying primary insurance; and fourth, the policy's coverage extended beyond car insurance. *Id*. at 81. As in *Allstate*, the Court held that Aetna's umbrella policy was not prorated and only paid after the USAA policy had been exhausted.

In *Insurance Company of North America*, the primary insurance policy was identified by stipulation and the federal district court in Oklahoma addressed the priority of two other policies. One policy had limits of $300,000 and specified it was primary if the driver owned the vehicle, excess if not owned by the driver, and responsible for a proportional share when it covered on the same basis as another policy. *Ins. Co. of N. Am.*, 746 F. Supp. at 61. The other policy was titled "Excess Blanket Catastrophe Liability Policy," provided up to $2,000,000 in coverage,

11

specified a retained limit below which it was not responsible, and charged a relatively low annual premium. *Id*.

The Court held that the second policy was a true excess policy and only paid after the first policy was exhausted. In reaching this conclusion, the Court listed the relevant factors: the second policy required maintenance of underlying insurance, its premium was modest compared to the stipulated primary policy, it insured against "ultimate new loss" in excess of the stated retained limit, it covered a broader array of possible injury, and it stipulated that it was excess over other insurance policies and would not contribute. *Id*. at 64. Summarizing the law from other courts, the Court concluded that the trend was to "read true excess policies for what they are, regardless of their name and regardless of excess clauses found in primary policies that attempt to limit risk by proration with true excess policies." *Id*.

### D.   The Nature of the Policies

Applying these judicially significant factors, the Court holds that Philadelphia's policy is essentially primary and Wausau's truly excess. Philadelphia provided primary coverage to Penquis for all accidents that occurred in Penquis-owned vehicles and excess coverage in the limited situation in which an insured, here extended by endorsement to volunteers, was involved in an accident in a non-Penquis-owned vehicle. The primary nature of Philadelphia's policy does not change although, "insofar as is pertinent to the covered occurrence here involved, [Philadelphia] promised their insured only secondary or excess coverage." *Allstate*, 445 F.2d at 1283.

Philadelphia attempts to distinguish its policy on the facts: "There appears to be an absence of case law involving a volunteer driver (ie. a named insured) who receives only excess coverage under a policy that provides essentially primary coverage for a *different* insured (i.e. the

entity for whom the volunteer provides services)." *Philadelphia's Mot. for Summ. J.* at 14. Claiming legal novelty, Philadelphia urges the Court to apply *Carrier* and require both policies to contribute equally. *Id.* at 15.

Philadelphia's argument, however, is premised on the contention that its policy does not provide primary coverage to drivers like Mr. Mushero. The Court disagrees. Although Philadelphia repeatedly argues that its policy "insures him *only* when he is using a covered auto that Penquis does not own," *Philadelphia's Reply to Wausau's Opp'n* at 3, Philadelphia identifies no language that excludes Mr. Mushero from the general provision that considers an "insured" as "[a]nyone else while using with your permission a covered 'auto' [that Penquis] own[s]." *Philadelphia Policy*, Attach. A, "Business Auto Coverage Form" at 2. Although volunteers are only mentioned by an endorsement that specifies "[a]nyone volunteering services to [Penquis] is an 'insured' while using a covered 'auto' [Penquis does not] own," the endorsement specifically provides that it is "added to the LIABILITY COVERAGE WHO IS AN INSURED." *Philadelphia Policy*, Attach. A, "Social Service Agencies—Volunteers as Insureds." Had Mr. Mushero been driving a Penquis-owned vehicle, Philadelphia would have provided primary coverage.

Similarly, although Philadelphia contends "insurance for covered autos that Penquis does not own is *always* excess over any other collectible insurance," *Philadelphia's Mot. for Summ. J.* at 15, Philadelphia identifies no language that excludes primary coverage if Mr. Mushero was driving an uninsured vehicle and no other collectible insurance existed.

Philadelphia points out that Penquis requires its volunteer drivers to drive insured vehicles and notes that Mr. Mushero signed such an agreement. *Philadelphia's Resp. to Wausau's Mot.* at 16. However, when determining the nature of a policy, "[t]he only appropriate

considerations are the two insurance policies through which the respective insurers and insureds manifested their contractual intent." *Carriers*, 404 A.2d at 220. Regardless of the internal practice of Penquis or a tacit, unwritten understanding between Penquis and Philadelphia, Philadelphia's written policy extends primary coverage to Mr. Mushero. Had Philadelphia not intended to be the primary insurer when a volunteer drove a Penquis-owned vehicle or an uninsured vehicle, it should have modified the terms of its policy to exclude such coverage.

In contrast, Wausau's policy reads like a true excess policy. The policy is entitled an "excess liability policy" and states throughout the text that it only provides excess coverage. It provides coverage only after a specified retained limit is met and insures 80,000 unidentified drivers and vehicles in all 50 states for low premiums. Finally, Wausau's "other insurance" clause specifies that it never contributes and only pays after all other insurance is exhausted.

Philadelphia makes two arguments for why Wausau's policy should not be deemed a true excess policy. First, unlike true excess policies, Wausau's policy "contains no requirement that Penquis or its volunteer drivers maintain other primary insurance" and the policy could therefore be "the *only* available insurance." *Philadelphia's Mot. for Summ. J*. at 13. Although many excess policies specifically require the maintenance of underlying insurance, setting a minimum retained limit is effectively the same thing: Wausau's coverage is not triggered unless the exposure is above the specified amount, regardless of whether the money is paid by another insurer or the insured.

Second, Philadelphia argues that it "is counterintuitive that a $500,000 excess policy would have been purchased when—if Wausau's position is credited—$1,100,000 in coverage *already* existed at the primary level under the Concord and Philadelphia Policies combined." *Philadelphia's Mot. for Summ. J*. at 13 n.5. Though an appeal to common sense is often

14

effective, Philadelphia provides no authority for its theory that the total amount of coverage for an individual insured determines whether a policy is truly excess. In any event, Penquis' reasons for purchasing its levels of coverage with different insurers, and more specifically the Wausau's policy, are not a matter of record and comparing total policy coverage amounts among multiple policies does not necessarily reveal Penquis' intent. Regardless of what Penquis may have intended when it purchased these policies, the policy language, not the insured's expectations, controls.

Here, the Court reads Wausau's "true excess polic[y] for what [it is], . . . regardless of excess clauses found in primary policies that attempt to limit risk by proration with true excess policies." *Ins. Co. of N. Am.*, 746 F. Supp. at 64. The Court concludes that Wausau does not have a duty to contribute to the defense or settlement of Ms. Lovely's claim against Mr. Mushero because Philadelphia's policy was not exhausted.

## III.   CONCLUSION

The Court GRANTS Wausau's Motion for Summary Judgment (Docket # 18) and ORDERS that judgment be entered in favor of Wausau. The Court DENIES Philadelphia's Motion for Summary Judgment (Docket # 16).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 5th day of April, 2010